IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>LUIS AURELIO RODRIGUEZ-<br>GARABITO,<br><br>Defendant. | No. CR11-3001<br><br>REPORT AND<br>RECOMMENDATION |

On the 18th day of February, 2011, this matter came on for hearing on the Motion to Suppress (docket number 8) filed by the Defendant on February 10, 2011. The Government was represented by Special Assistant United States Attorney Justin Aaron Lightfoot. Defendant Luis Aurelio Rodriguez-Garabito appeared in court and was represented by his attorney, Leslie E. Stokke.

## I. PROCEDURAL HISTORY

On January 12, 2011, Defendant was charged in a one-count indictment with possession with intent to distribute 50 grams or more of methamphetamine. Defendant entered a plea of not guilty and the trial was scheduled before Chief Judge Linda R. Reade on March 14, 2011. On February 16, 2011, however, a grand jury returned a superseding indictment, adding a second count: conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine and 500 grams or more of cocaine. At Defendant's request, the trial was then continued to April 18, 2011.

On February 10, 2011, Defendant timely filed the instant motion to suppress. The Government filed its resistance on February 14, 2011.

## II. RELEVANT FACTS

In the afternoon of December 20, 2010, officers with the North Central Iowa Narcotics Task Force entered an apartment building located near the courthouse in Hampton, Iowa. The officers had an arrest warrant for Jorge Morales, and a warrant to search Morales' apartment. Morales lived in apartment 205 and Defendant lived on the same floor in apartment 210.

Ray Beltran, the Chief of Police in Hampton, testified that he was part of the team which entered the apartment building that day. Beltran testified that his role was primarily as an interpreter, with the Task Force directing the operation. Beltran was born and raised in Texas, and spoke Spanish exclusively until he started elementary school. According to Beltran, he "grew up speaking Spanish" and still speaks fluent Spanish.

As the officers were proceeding down the hallway, Chief Beltran saw Jorge Morales – who was known to Beltran – stick his head out of Defendant's apartment. Beltran told Morales to stop and "grabbed him out in the hallway." Defendant's apartment door was left open. Beltran saw Defendant sitting on a sofa in the apartment and "waved" for him "to come over toward me and I grabbed him and put him in the hallway." Beltran also saw a third person in the apartment.

Jorge Morales was taken into custody pursuant to the arrest warrant, and returned to his apartment by other officers. Chief Beltran then accompanied Defendant back into his apartment. Beltran could not recall whether Defendant was handcuffed while he was in the hallway, but a photograph of Defendant appears to show that he was handcuffed while sitting in his apartment. *See* Government's Exhibit 2. The third person was also handcuffed "for safety reasons."

According to Chief Beltran, he discussed Defendant's consent to search the apartment "right away" after they entered the apartment. Beltran testified that Defendant "proceeded to okay the search even before I was going to explain the consent form." According to Beltran, "I slowed him down" and told Defendant that he needed to review

2

the consent form. Beltran then reviewed the "Permission to Search" form – which is written in English – with Defendant. *See* Government's Exhibit 1. Beltran did not translate the form "word for word," but rather explained to Defendant that it was "permission to search the apartment." Defendant said "no problem" and signed the form at 1:20 p.m. After Defendant finished signing the permission to search, Beltran heard other officers mention they could smell marijuana. When Beltran asked Defendant about it, Defendant pointed to marijuana nearby. A subsequent search of the apartment revealed illegal controlled substances.

Chief Beltran testified that he did not know the extent of Defendant's education, or Defendant's English language skills. All of Defendant's conversations with Beltran were in Spanish. According to Beltran, he did not have any difficulty communicating with Defendant in Spanish. At no time was Defendant given a *Miranda* warning.

Chief Beltran testified that he had one prior interaction with Defendant, when Defendant was stopped for driving without a driver's license. Jorge Morales was a passenger in the vehicle. Defendant consented to a search of his vehicle. A "canine" was also brought to the scene. No contraband was found in the vehicle, however, and Defendant was given a traffic citation and allowed to leave.

### III. DISCUSSION

Defendant claims in his motion to suppress that his consent to search the apartment was not given voluntarily, and the fruits of the search must therefore be suppressed. Preliminarily, the Court notes that Defendant does *not* claim that the officers' entry into the apartment was unlawful. In addition, Defendant concedes that he gave the officers consent to search the apartment. Defendant argues, however, that he consented to the search "because he was confused as to what he had signed."[1]

The Fourth Amendment protects persons and their property against unreasonable searches and seizures. A warrantless search is presumptively unreasonable. *United States*

---

[1] *See* Defendant's Brief (docket number 8-1) at 3.

v. *Castaneda*, 438 F.3d 891, 893 (8th Cir .2006). However, a voluntary consent to search is a valid exception to the warrant requirement. *United States v. Guzman*, 507 F.3d 681, 687 (8th Cir. 2007); *United States v. Almendares*, 397 F.3d 653, 660 (8th Cir. 2005) ("A warrantless search does not violate the Fourth Amendment if knowing and voluntary consent was given."). The Government bears the burden of proving by a preponderance of the evidence that the consent was given voluntarily and that the officers reasonably believed that the search was consensual. *United States v. Esquivel*, 507 F.3d 1154, 1159 (8th Cir. 2007).

"A consent is voluntary if the consenting individual had 'a reasonable appreciation of the nature and significance of his actions.'" *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007) (quoting *United States v. Rambo*, 789 F.2d 1289, 1297 (8th Cir. 1986)). Stated otherwise, Defendant's consent was voluntary "if it was the product of an essentially free and unconstrained choice, rather than the product of duress or coercion, express or implied." *United States v. Morreno*, 373 F.3d 905, 910 (8th Cir. 2004). The Court must view the totality of the circumstances and determine whether the "pressures exerted upon the suspect have overborne his will." *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989).

In determining whether consent to search was given voluntarily, the Court must consider "both the characteristics of the accused and the details of the interrogation." *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). In the often-cited case of *United States v. Chaidez*, the Court listed some of the personal characteristics which are relevant in determining the voluntariness of a person's consent:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously

arrested, they were aware of the protections afforded to suspected criminals by the legal system.

*United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990) (internal citations omitted).

The Court will review the *Chaidez* factors: Defendant was 23 years old at the time of the search.[2] Apparently, Defendant has a sixth grade education.[3] Defendant makes no claim that he is of below-average intelligence. While some of the officers apparently detected the smell of burnt marijuana in Defendant's apartment, there is no evidence that he was smoking marijuana shortly prior to giving consent, or that he was under the influence of any drugs or alcohol at that time.[4] It is undisputed that Defendant was not given a *Miranda* warning. While a failure to *Mirandize* a subject is a factor to be considered in determining the voluntariness of his consent, a *Miranda* warning was not required. *Saenz*, 474 F.3d at 1137 ("We have not required an officer to provide *Miranda* warnings before requesting consent to search or held that an absence of *Miranda* warnings would make an otherwise voluntary consent involuntary."). Similarly, Defendant was apparently not advised of his "right to withhold consent." While this is a factor which must be considered in determining voluntariness, "awareness of the right to refuse is not necessary for consent to be voluntary." *United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001) (citing *United States v. Barahona*, 990 F.2d 412, 417 (8th Cir. 1993)); *United*

---

[2] The record made at the time of hearing is silent regarding Defendant's age, but in his brief the Defendant states that he was born in July 1987. *See* Defendant's Brief (docket number 8-1) at 2. Similarly, the Government asserts in its brief that Defendant was 23 years old at the time of the search. *See* Government's Brief (docket number 10-1) at 6.

[3] Again, the record is silent regarding this fact, but the parties' briefs are in agreement. In response to a question by Defendant's counsel, Chief Beltran testified he would not be "surprised" if Defendant had a sixth grade education.

[4] Chief Beltran testified that it appeared there had been "recent usage," but apparently Defendant was not asked if he or the other occupants of the apartment had been smoking marijuana.

5

*States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009) (same). Defendant had some prior dealings with Chief Beltran, including a consent search of his vehicle, but the record is silent regarding whether he was "aware of the protections afforded to suspected criminals by the legal system."

In addition to "personal characteristics," the Court must also consider the "environment" surrounding the consent to search. The Court in *Chaidez* suggested that courts should ask whether the person who consented:

> (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*Chaidez*, 906 F.2d at 381 (internal citations omitted).

Here, Defendant gave consent to search the apartment almost immediately upon reentering the apartment. There is no evidence that Defendant was threatened or physically intimidated by Chief Beltran prior to giving consent. At Defendant's request, Beltran provided Defendant with a bottle of water. There is no evidence in the record to support the claim made in Defendant's brief that "Chief Beltran told the Defendant to sign the document because it doesn't it [*sic*] means [*sic*] that he is dealing drugs."[5] The record is imprecise regarding whether Defendant was handcuffed when he gave consent to search the apartment. However, Defendant was not "under arrest" at that time. Finally, there is no evidence to suggest that Defendant objected to the search at any time, or attempted to withdraw his consent.

The factors described in *Chaidez* "should not be applied mechanically," but instead serve as a guide to the Court's analysis of voluntariness. *Chaidez*, 906 F.2d at 381. Ultimately, the Court must examine the totality of the circumstances to determine whether

---

[5] *See* Defendant's Brief (docket number 8-1) at 2.

Defendant's consent to search his apartment was given voluntarily. *Bradley*, 234 F.3d at 366. Defendant – whose English-speaking skills are unknown – gave consent in Spanish to Chief Beltran, who speaks fluent Spanish. Beltran testified that Defendant gave oral consent to search the apartment even before Beltran was able to review the written consent form. *Saenz*, 474 F.3d at 1136-37 ("Consent can be given orally or in writing, and it is not necessary to use a written consent form."). Beltran testified that he nonetheless explained the written consent form in Spanish, Defendant replied "no problem," and then signed the consent to search his apartment. The Court finds that Beltran is a credible witness. Defendant's argument that he "was confused as to what he had signed" is not supported by the evidence. I believe Defendant had a reasonable appreciation of the nature and significance of his consent, *Saenz*, 474 F.3d at 1136, and that his consent was voluntary. Accordingly, Defendant's motion to suppress should be denied.

## IV. RECOMMENDATION

For the reasons set forth above, the Court hereby **RECOMMENDS** that the Motion to Suppress (docket number 8) filed by the Defendant on February 10, 2011 be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report and Recommendation, they must promptly order a transcript of the hearing held on February 18, 2011.*

DATED this 25th day of February, 2011.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA